**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JAMES H. ECKMAN

        Plaintiff,

v.                                                                                                         Case No. 05-2318-DJW

SUPERIOR INDUSTRIES
INTERNATIONAL, INC., et al.,

        Defendants.

## MEMORANDUM AND ORDER

Acting *pro se*, Plaintiff brings this lawsuit against his former employer, Superior Industries International, Inc. ("Defendant"), alleging a Kansas state law claim for retaliatory discharge. Subject matter jurisdiction is invoked under 28 U.S.C. § 1332, diversity of citizenship, and is not disputed. This action is before the Court on Defendant's Motion For Summary Judgment (doc. 74). For the reasons set forth below, Defendant's Motion will be granted.

## Factual Background

The following material facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to Plaintiff.

1. Plaintiff began working for Defendant on July 14, 2000.

2. Plaintiff was promoted to team leader in the fettling department in February 2002.

3. Plaintiff spoke to Joe Allen ("Allen") in the safety department regarding a lack of emergency safety lighting in the fettling area several times prior to 2005.

4. In early February 2005, Plaintiff contacted Scott Mallory ("Mallory") in the safety department and expressed concern that there was no emergency safety lighting in the fettling department. Mallory responded by stating that the emergency lighting concern was "on the

books." Plaintiff assumed "on the books" meant that Defendant was in the process of addressing the lack of emergency lighting.

5. On March 1, 2005, Plaintiff called Defendant's Human Resource manager, Leo Sievert ("Sievert"), and expressed concern that there was no emergency safety lighting in the fettling department. Plaintiff made this telephone call from his home. During this conversation, Plaintiff told Sievert that Plaintiff had been complaining about the lighting issue for two and one-half years to several safety personnel, but nothing had been done about it. Plaintiff explained to Sievert that during power outages, the lack of emergency lighting makes it very unsafe for workers in the fettling area because the workers are not be able to see to get out of the cells within which they were working. In response to his concern, Sievert told Plaintiff he would relay Plaintiff's concerns to Tim Rakestraw ("Rakestraw"), Defendant's Safety Supervisor, and that he would look into it.

6. After this conversation, Plaintiff called Andy Hewitt ("Hewitt") at the Pittsburg City Codes Enforcement Department to inquire into the city's emergency lighting codes. Plaintiff placed this call from his home. Plaintiff provided Hewitt with measurements regarding the fettling department area and informed Hewitt of the lack of emergency lighting. Based on the information provided, Hewitt told Plaintiff that there should be at least two emergency lighting units in the fettling department area. During this conversation with Hewitt, Plaintiff did not divulge the name of the company about which he was inquiring. Plaintiff states that he was making the inquiry solely for informational purposes, that he did not request an inspection, and that he did not file a complaint.

7.  After hanging up with Hewitt – and approximately one hour after his initial conversation with Sievert – Plaintiff called Sievert back. Plaintiff told Sievert that he had talked to Hewitt at the Pittsburg City Codes Enforcement Department and that Hewitt told Plaintiff there should be at least two emergency lighting units in the fettling department area. Plaintiff did not tell Sievert that Plaintiff's call to the Pittsburg City Codes Enforcement Department was an anonymous inquiry and that Plaintiff had not divulged the name of the company when he talked to Hewitt. Seivert told Plaintiff that he would handle it.

8.  Later that day, Sievert informed Rakestraw that Plaintiff had called him with a concern about safety lighting. Sievert asked Rakestraw to make contact with Plaintiff and find out exactly what his concerns were.

9.  Rakestraw does not recall whether Sievert told him that Plaintiff had contacted the Pittsburg City Codes Enforcement Department regarding Plaintiff's concerns about inadequate emergency lighting.

10. Rakestraw was unable to contact Plaintiff about the lighting issue on March 2, 2005 because Plaintiff called in sick.

11. On March 3, 2005, Rakestraw went to the fettling area to contact Plaintiff regarding Plaintiff's safety lighting concerns. Rakestraw noticed Plaintiff in Cell 3 working inside a machine. At the same time, Rakestraw noticed Steve Bass working in Cell 5. Rakestraw decided to check both cells to see if they were "locked out." For safety reasons, it is important for the cell to be locked out. Locking out a cell prevents the machinery from operating while the employee is inside the cell and, therefore, prevents the possibility of injury.

12. Jack Shulte, Plant Supervisor, testified that if a supervisor discovers a cell is not locked out, the supervisor should immediately remedy the situation so that no one gets hurt. It is a safety issue.

13. Rakestraw determined Cell 5 was properly locked out with Steve Bass' lock.

14. By this time Plaintiff was in Cell 4. Rakestraw inspected Cell 4 and determined it was not properly locked out. Rakestraw did not tell Plaintiff to get out of the cell, but used his radio to contact Jeff Newman ("Newman"), Plaintiff's supervisor. When Newman arrived, Rakestraw informed Newman that Rakestraw had checked both sides of the cell and Plaintiff was not locked out. When Rakestraw then turned around to talk to Plaintiff, however, Plaintiff was no longer in Cell 4 and was not in sight.

15. Plaintiff was in Cell 7 when Rakestraw found him. Rakestraw told Plaintiff that Human Resources manager Sievert had informed Rakestraw that Plaintiff had concerns regarding emergency safety lighting and that Rakestraw wanted to talk to Plaintiff about it. Plaintiff stated that nobody cared and that he did not want to discuss it anymore.

16. Rakestraw then informed Plaintiff that Plaintiff had not been properly locked out when Plaintiff was in Cell 4; thus, Plaintiff was in violation of Defendant's policy for being in a fettling cell without a proper lockout. Plaintiff denied that he was not properly locked out in Cell 4 and went on to note that he currently was properly locked out in Cell 7. Plaintiff further stated to Rakestraw that it was very convenient for Rakestraw to confront him about an alleged failure to lockout at a time when Plaintiff was no longer in the cell and could not prove the falsity of the allegation.

17. Rakestraw told Plaintiff they would get back to Plaintiff regarding his failure to lock out while in Cell 4.

18. After the conversation with Plaintiff, Rakestraw discussed the violation with Newman, Plaintiff's supervisor. Rakestraw told Newman he would report the matter to Sievert, the Human Resources manager. Rakestraw subsequently prepared a statement regarding his meeting with Plaintiff and submitted it Sievert.

19. Rakestraw reported to Sievert that he had spoken to Plaintiff, and Plaintiff indicated he did not want to discuss the lighting issue. Rakestraw also informed Sievert during this conversation that Plaintiff had not been properly locked out of Cell 4 upon inspection.

20. After learning about Plaintiff's alleged safety infraction, Sievert spoke to Keith Vann ("Vann") as a witness to the alleged rule violation. Vann did not want to sign a statement regarding the incident because he was not in a position to know whether or not Plaintiff was properly locked out of Cell 4. There may have been other possible witnesses, but Sievert did not talk to them.

21. Company policy states that a failure to lock out will result in a three-day suspension without pay.

22. Rakestraw does not have authority to discipline an employee; he has to have permission from the Human Resources department.

23. Sievert determined it was appropriate to write Plaintiff up for the safety violation and impose a three-day suspension without pay. Sievert requested Rakestraw complete the disciplinary action form.

24. Rakestraw completed the disciplinary action form and then sent it to Sievert for his review. Sievert signed the form as did Joe Sutckwisch, the foundry manager.

25. Sievert asked Rakestraw to administer the disciplinary action with a human resources representative that evening when Plaintiff came to work.

26. On March 3, 2005, upon entering Defendant's premises, Plaintiff was directed to a meeting with Rakestraw; Jack Shulte ("Shulte"), Plant Superintendent; and Heather Hughes ("Hughes"), Human Resource Specialist.

27. It is Defendant's policy to have at least two people sit in on a suspension or termination meeting and then to prepare statements for the file that document the meeting.

28. Plaintiff was informed he was being disciplined for failing to lockout the fettling cell.

29. Rakestraw laid the paperwork out for Plaintiff and attempted to read it to him.

30. As Rakestraw began to read the form to Plaintiff, Plaintiff stated he was not signing anything and said it was "bullshit." Rakestraw continued to read the paperwork to Plaintiff and explain the suspension. Plaintiff again stated it was "bullshit," stood up, and continued to curse as he asserted he was properly locked out at all times and had witnesses to prove it.

31. Plaintiff continued to repeatedly deny the violation and Rakestraw informed Plaintiff that Plaintiff had the right to supply a written comment on the form.

32. Plaintiff declined to write a comment or sign the disciplinary form and left the office. Rakestraw called out after Plaintiff that they needed his identification badge. In response, Plaintiff angrily tossed the identification badge at Rakestraw and it struck Rakestraw on the shoulder.

33. Ten minutes later, Plaintiff called into the plant and the call was directed to Rakestraw. Plaintiff did not want to talk to Rakestraw and started cursing, telling Rakestraw that "he would have his fucking job." Plaintiff demanded that someone higher up in the company call him the next morning. Rakstraw informed Plaintiff that Plaintiff could call the next day and discuss the issue with Human Resources Manager Sievert.

34. Rakestraw prepared a statement regarding the suspension meeting as required by policy.

35. The morning after Plaintiff's suspension meeting, Rakestraw went into Sievert's office, submitted his written statement and explained that the suspension meeting had not gone well – Plaintiff denied the violation, became upset, raised his voice, used foul language, and threw his badge at Rakestraw.

36. Sievert followed up by speaking to Hughes and Shulte about the events that had transpired at the suspension meeting.

37. In addition to speaking with Rakestraw, Hughes and Shulte, Sievert reviewed the written statements of all three of these individuals.

38. Plaintiff called Sievert on Monday, March 7, as Plaintiff was supposed to return from his suspension the next day. In this conversation, Plaintiff again denied the lockout violation but admitted that at the suspension meeting he became upset, used foul language and angrily tossed his badge at Rakestraw. Sievert told Plaintiff that Plaintiff's behavior at the suspension hearing was being investigated and they would let him know if he was going to be terminated.

39. On Tuesday, March 8, 2005, Sievert called Plaintiff and informed Plaintiff that he was being terminated for his actions in the suspension meeting: insubordination, mistreatment of a

fellow employee, and behaving in an argumentative manner. Plaintiff responded by telling Sievert that he was properly locked out at all times. Sievert explained that Plaintiff was not being terminated for the safety violation but for Plaintiff's inappropriate behavior at the suspension meeting.

### **Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[3] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[4]

The moving party bears the initial burden of demonstrating an "absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[5] In attempting to meet that standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[6]

---

[1] Fed. R. Civ. P. 56(c).

[2] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[3] *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[4] *Id.*

[5] *Id.* at 670-71 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[6] *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[10]

The Court notes summary judgment is not a "disfavored procedural shortcut" but an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[11]

## Discussion

Plaintiff claims Defendant terminated his employment on March 8, 2005, in violation of Kansas public policy and common law, because he reported workplace safety violations to the Pittsburg City Codes Enforcement Department. Defendant, however, maintains the undisputed facts demonstrate Plaintiff was terminated for legitimate business reasons; thus, judgment should be entered in favor of Defendant as a matter of law.

**I.     Applicable Legal Standards**

    **A.     State Law Claim of Retaliatory Discharge in Violation of Public Policy**

---

[7]*Anderson*, 477 U.S. at 256; *Adler*, 144 F.3d at 671.

[8]*Id.*

[9]*Adler*, 144 F.3d at 671.

[10]*Id.*

[11]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The appropriate starting place to determine whether Plaintiff's state law claim for retaliatory discharge in violation of public policy can survive Defendant's Motion for Summary Judgment is Kansas law regarding the employer/employee relationship. "Kansas employment law is grounded in the doctrine of employment-at-will. In the absence of an express or implied contract of duration or where recognized public policy concerns are raised, employment is terminable at the will of either party."[12] In other words, an employer may terminate an employee for good cause, no cause, or even for the wrong cause.

"So far, Kansas courts have departed from the at-will doctrine and recognized a common law tort for wrongful discharge in violation of public policy in two types of cases, those in which a terminated employee has acted as a whistleblower and those in which the employee has filed a workers compensation claim."[13] Relevant to Plaintiff's claims in this lawsuit, the whistleblower exception provides a cause of action for retaliatory discharge where an employee is terminated for reporting to company management or law enforcement serious legal violations by co-workers or the employer.[14]

Under Kansas law, a plaintiff establishes a prima facie case of retaliatory discharge by showing that (1) a reasonably prudent person would have concluded that plaintiff's co-worker or employer was violating rules, regulations or the law pertaining to public health, safety and general

---

[12]*Hysten v. Burlington Northern Santa Fe Ry. Co.*, 277 Kan. 551, 108 P.3d 437 (2004) (quoting *Riddle v. Wal-Mart Stores, Inc.*, 27 Kan.App.2d 79, Syl. ¶ 2, 998 P.2d 114 (2000)).

[13]*Id.* (citing *Palmer v. Brown*, 242 Kan. 893, 900, 752 P.2d 685, 689-90 (1988) (whistleblowing) and *Murphy v. City of Topeka-Shawnee County Dept. of Labor Services*, 6 Kan.App.2d 488, 495-97, 630 P.2d 186 (1981) (workers' compensation)).

[14]*Koehler v. Hunter Care Ctrs., Inc.*, 6 F.Supp.2d 1237, 1241 (D. Kan.1998) (citing *Palmer v. Brown*, 242 Kan. at 900, Syl. ¶ 2, 752 P.2d at 689-90).

welfare; (2) the reporting of the alleged violation was done in good faith based on a concern regarding that wrongful activity, rather than a corrupt motive like malice, spite, jealousy or personal gain; (3) the employer knew of the employee's report before it discharged the employee; and (4) defendant discharged the employee in retaliation for making the report.[15]

### B.     The *McDonnell Douglas* Burden-Shifting Process

Because Plaintiff's claim of retaliatory discharge is based on circumstantial evidence, the Court will apply the *McDonnell Douglas* burden-shifting process to evaluate Plaintiff's claim.[16] Under the *McDonnell Douglas* framework, plaintiff has the initial burden of establishing a prima facie case, which raises a rebuttable presumption of retaliatory intent.[17] Once plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory justification for the discharge.[18] Finally, if defendant meets this burden, the burden shifts back to plaintiff to "assert specific facts establishing a triable issue as to whether the employer's reason for discharge is a mere cover-up or pretext for retaliatory discharge."[19]

### C.     The Applicable Standard of Proof

Although the burden-shifting process utilized to establish a retaliatory discharge claim is clearly defined, the appropriate standard of proof to apply within the burden-shifting process is much

---

[15]*Goodman v. Wesley Med. Ctr., L.L.C.*, 276 Kan. 586, 589-90, 78 P.3d 817, 821 (2003) (citing *Palmer*, 242 Kan. at 900, 752 P.2d at 689-90).

[16]*Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 824 (1973)).

[17]*Id.*

[18]*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1116 (10th Cir. 2001).

[19]*Foster*, 293 F.3d at 1194 (quoting *Braken v. Dixon Indus., Inc.*, 272 Kan. 1272, 1276, 38 P.3d 679, 682 (2002)).

less clear. Under Kansas law, a retaliatory discharge claim must be established by a preponderance of the evidence, but the evidence must be clear and convincing in nature.[20] With that said, the Kansas Supreme Court also has held that a plaintiff "need not meet the clear and convincing standard at the summary judgment stage of the proceedings."[21]

Although Plaintiff's claim for retaliatory discharge is grounded in Kansas law, this case is pending in federal court. A federal court evaluating state claims is guided by federal standards governing summary judgment procedure. Thus, the evidentiary standard applied by Kansas courts on summary judgment is inapplicable.[22] In contrast to the rule espoused by the Kansas Supreme Court, "a plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate fact finder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer."[23] Notably, Plaintiff is not required to establish the elements of his prima facie case by clear and convincing evidence.[24] The clear and convincing evidence standard only applies once the burden shifts back to Plaintiff to demonstrate that the employer's proffered reasons for termination are pretextual.[25]

---

[20]*Ortega v. IBP, Inc.*, 255 Kan. 513, 528, 874 P.2d 1188, 1198 (1994).

[21]*Rebarchek v. Farmers Coop. Elevator*, 272 Kan. 546, 552, 35 P.3d 892, 898 (2001).

[22]*Foster*, 293 F.3d at 1194-95.

[23]*Id.* at 1195.

[24]*Id.* at 1193 n.3 (holding plaintiff to such standard at prima facie stage would pervert logic of McDonnell Douglas burden-shifting scheme adopted by Kansas courts; claimant's prima facie case not onerous burden).

[25]*Id.* at 1193 (if employer offers legitimate, nondiscriminatory reason for termination, burden shifts to plaintiff to show clear and convincing evidence of retaliation).

**II.     Analysis**

      **A.     Prima Facie Case of Retaliatory Discharge**

            *1.     Whether a Reasonably Prudent Person Would Have Thought the Lack of Any Safety Lighting in the Fettling Area Was in Violation of Any Rule or Law*

Defendant argues there is insufficient evidence to establish that a reasonably prudent person would have thought the safety lighting in the fettling area was in violation of any rules or laws. In support of this argument, Defendant maintains it is undisputed by Plaintiff that prior to March 2005, the plant had passed two OSHA audits and no government agency had ever notified Defendant that lighting in the plant was substandard.

Although the facts submitted by Defendant may be undisputed by Plaintiff, the Court is not persuaded that these facts prohibit Plaintiff from establishing the first element of his prima facie case. As noted above, Plaintiff's burden to establish a prima facie case is not onerous.[26] In support of a prima facie case, Plaintiff states he believes the lack of emergency safety lighting in the fettling area was a violation of city code pertaining to safety conditions in a work environment. Plaintiff states his belief is grounded in (1) Plaintiff's own experience working in the fettling department during a power outage; and (2) a statement made by Andy Hewitt at the Pittsburg City Codes Enforcement Department that, based on area measurements provided by Plaintiff, there should be at least two emergency lighting units in the fettling area. Based on these facts, the Court finds there has been sufficient evidence presented to demonstrate that Plaintiff personally believed there was a violation.

---

[26]*Id.* at 1193 n.3.

13

In order to establish the first element of a prima facie case of retaliatory discharge, however, Plaintiff must go beyond his subjective belief to demonstrate that a reasonably prudent person would have believed the lack of emergency safety lighting in the fettling area was a violation of city code pertaining to safety conditions in a work environment. In order to establish this objective element, Plaintiff relies on (1) the statement Andy Hewitt at the Pittsburg City Codes Enforcement Department that there should be at least two emergency lighting units in the fettling area; and (2) the statement of Plaintiff's supervisor Jeff Newman, who provided the following deposition testimony:

Q: "Mr. Newman, have you ever been in the fettling department during a power outage?"
A: "Yes"
Q: "Can you please describe those conditions?"
A: "Very dark."
Q: "Would you consider these conditions unsafe?"
A: "Yes."[27]

Based on these facts, the Court finds Plaintiff has adequately demonstrated that a reasonably prudent person would have thought the lack of any emergency safety lighting in the fettling area was a violation of a rule or law pertaining to safety conditions in the work environment. Thus, Plaintiff has met the burden of proof necessary to resist summary judgment on this first element.

> *2.  The reporting of the alleged violation was done in good faith based on a concern regarding that wrongful activity, rather than a corrupt motive like malice, spite, jealousy or personal gain*

Defendant does not dispute evidence presented by Plaintiff that he contacted the Pittsburg City Codes Enforcement Department in good faith based on a safety concern regarding the lack of

---

[27]Plaintiff's deposition of Jeff Newman on September 27, 2006, p. 9, lines 10-16.

emergency lighting in the fettling area. Thus, Plaintiff has provided sufficient evidence to resist summary judgment on this second element.

### 3. *The employer knew of the employee's report before it discharged the employee*

As a preliminary matter, Defendant argues Plaintiff cannot establish the third element of a prima facie case because it is impossible for Defendant to know about a complaint that was never reported in the first instance. More specifically, Defendant argues that during Plaintiff's conversation with the Pittsburg City Codes Enforcement Department, Plaintiff did not divulge the name of the company about which he was inquiring. Defendant further argues Plaintiff readily admits he was making the inquiry solely for informational purposes, that he did not request an inspection, and that he did not file a complaint. Given there was no complaint or report in the first instance, Defendant argues it is impossible for Defendant to have known about a report or complaint before Defendant terminated Plaintiff's employment.

The Court is not persuaded by Defendant's argument here. Although the facts cited by Plaintiff are undisputed, these facts focus on the conversation between Plaintiff and Hewitt at the Pittsburg City Codes Enforcement Department, not on what Defendant's representatives knew about that conversation. To that end, the parties dispute the following two material facts regarding what Defendant knew.

1. Anonymity

    a. Relying on Sievert's deposition testimony, Defendant asserts that Plaintiff told Sievert that he did not use the company name when talking to the Pittsburg City Codes Enforcement Department.

    b. Relying on Plaintiff's deposition testimony, Plaintiff asserts he specifically did not tell Sievert that he had made the call to the Pittsburg City Codes Enforcement Department anonymously.

15

2. Rakestraw's Knowledge

   a. Relying again on Sieverts' deposition testimony, Defendant asserts Sievert did not tell Rakestraw that Plaintiff had called the Pittsburg City Codes Enforcement Department.

   b. Relying on Rakestraw's deposition testimony, Plaintiff asserts Rakestraw does not recall whether Sievert told him about Plaintiff calling the Pittsburg City Codes Enforcement Department.

Given this factual dispute, and viewing the evidence presented in a light most favorable to Plaintiff as required on summary judgment, the Court finds Plaintiff has sufficiently established the following facts: (1) Plaintiff told Sievert that he had talked to Hewitt at the Pittsburg City Codes Enforcement Department and that there should be at least two emergency lighting units in the fettling department area; (2) Plaintiff did not tell Sievert that Plaintiff's call to the Pittsburg City Codes Enforcement Department was an anonymous inquiry and that Plaintiff had not divulged the name of the company when he talked to Hewitt; and (3) Rakestraw does not recall whether Sievert told him that Plaintiff had contacted the Pittsburg City Codes Enforcement Department regarding Plaintiff's concerns about inadequate emergency lighting.

Based on these facts, the Court finds that Defendant knew about Plaintiff's report to the Pittsburg City Codes Enforcement Department before Plaintiff was terminated from employment and, thus, Plaintiff sufficiently has met his burden of proof with regard to the third element of his prima facie case. That the report was actually anonymous in nature and made by Plaintiff for informational purposes only is immaterial to the Court in reaching this conclusion. This is because – regardless of what actually transpired – there is sufficient evidence to demonstrate that Defendant

*believed* Plaintiff made a report to the Pittsburg City Codes Enforcement Department about Defendant's unsafe lighting conditions.[28]

   *4. Defendant discharged the employee in retaliation for making the report*

To recover for retaliatory discharge, an employee must prove that the discharge was based on an intent to retaliate. The employee need not prove that retaliation was the sole motive for the termination.[29] Based on the undisputed facts presented in this case, the timing provides sufficient inference of a retaliatory motive. "Protected conduct closely followed by an adverse action may justify an inference of retaliatory motive."[30] Plaintiff was terminated on March 8, 2005, less than one week after reporting the safety lighting issue to the Pittsburg City Codes Enforcement Department. The Court finds that this temporal proximity is sufficient to satisfy the fourth element of the prima facie case.[31]

  **B. Defendant's Burden to Articulate a Legitimate, Non-Retaliatory Reason for Discharge**

Because the Court finds, *supra*, that Plaintiff successfully has met the burden of establishing all four elements of a prima facie case, the burden of production now shifts to Defendant to

---

[28]*See Pilcher v. Board of County Comm'rs of Wyandotte County*, 14 Kan.App.2d 206, 787, Syl ¶ 3, P.2d 1204, *rev. denied*, 246 Kan. 768 (1990) (holding that an employee-at-will, wrongfully discharged because the employer *perceived* that the employee has reported illegal or improper hiring practices of the employer, has a cause of action for retaliatory discharge for "whistle-blowing" against the employer) (emphasis added).

[29]*Lierz v. Coca Cola Enterprises, Inc.*, 36 F. Supp.2d 1295, 1301 (D. Kan. 1999) (citing *Ali v. Douglas Cable Communications*, 929 F.Supp. 1362, 1387 (D. Kan.1996) (citing *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 146-48, 815 P.2d 72 (1991))).

[30]*Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir.), *cert. denied*, 518 U.S. 1019 (1996).

[31]*Id.*

articulate a facially nondiscriminatory reason for terminating Plaintiff's employment.[32] The Court finds Defendant has met this burden by proffering that it discharged Plaintiff for his inappropriate actions in the suspension meeting; namely, insubordination, mistreatment of a fellow employee, and behaving in an argumentative manner.

### C. Plaintiff's Burden to Assert Specific Facts Establishing a Triable Issue as to Whether Defendant's Reason for Discharge is Pretext for Retaliatory Discharge

To avoid summary judgment at this third and final stage of the *McDonnell Douglas* process, Plaintiff must assert specific facts that suggest Defendant's explanation for termination is merely pretext for a retaliatory discharge.[33]  Pretext may be established by showing either "that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence."[34]  "At the summary judgment stage, if the plaintiff produces both a prima facie case and evidence supporting a finding that 'defendant's alleged nondiscriminatory reasons for the employment decisions are pretextual, the case should go to the factfinder.'"[35]

With regard to Plaintiff's conduct at the suspension meeting, the following facts are uncontroverted by Plaintiff: At the meeting, Plaintiff became very angry, cursed, and tossed his identification badge at Rakestraw, which ultimately struck Rakestraw in the shoulder. Shulte, Hughes and Rakestraw all wrote reports documenting Plaintiff's inappropriate behavior during the

---

[32]*See Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).

[33]*Id.*

[34]*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

[35]*Jones v. Unisys Corp.*, 54 F.3d 624, 630 (10th Cir. 1995) (quoting *Ingels v. Thiokol Corp.,* 42 F.3d 616, 622 (10th Cir. 1994)).

meeting and later testified to the conduct. Plaintiff does not dispute any of the documented behavior or the fact that he called Rakestraw by telephone immediately after the meeting and repeatedly cursed at him.

When Plaintiff called the day before his suspension was to be lifted, Plaintiff was informed by HR Manager Sievert that he was suspended pending investigation of his inappropriate conduct during the suspension meeting. Plaintiff was advised by Sievert the following day that he was being terminated for his actions. During the termination conversation, Plaintiff informed Sievert that the suspension was unfair because he was properly locked out of his cell. Sievert made it clear to Plaintiff that was not being terminated for failing to properly lock out, but for his inappropriate actions during the suspension meeting.

In response to all of these undisputed facts, Plaintiff has failed to provide any supplemental or contrary facts to demonstrate the legitimate, non-retaliatory reason proffered by Defendant for discharging Plaintiff is pretextual. Although Plaintiff does assert in his briefing that there were other employees who used profanity and displayed disruptive behavior who were not terminated, Plaintiff provides no facts or evidence to support this conclusory assertion. Moreover, there is no evidence to demonstrate that the profanity and disruptive behavior of these unnamed employees was in any way comparable to (1) the level of insubordination; (2) the mistreatment of a fellow employee; and (3) the argumentative behavior for which Plaintiff was terminated.

Under the *McDonnell Douglas* framework set forth above, Plaintiff bears the ultimate burden to assert specific facts establishing a triable issue as to whether the employer's reason for discharge is a pretext for retaliatory discharge. Plaintiff has failed to assert any such facts; thus, summary judgment in favor of Defendant is appropriate.

For the reasons set forth above, Defendant's Motion for Summary Judgment (doc. 74) is granted in its entirety.

IT IS SO ORDERED.

Dated in Kansas City, Kansas on this 2nd day of July 2007.

s/ David J. Waxse
David J. Waxse
United States Magistrate Judge

cc:     All counsel and *pro se* parties